John D. DECKARD, Appellant,

v.

STATE of Indiana, Appellee.

No. 53S00–9302–CR–269.

Supreme Court of Indiana.

Aug. 7, 1996.

Susan K. Carpenter, Public Defender, Eric K. Koselke, Special Assistant to the State Public Defender, Indianapolis, for Appellant.

Pamela Carter, Attorney General, Suzann Weber Lupton, Deputy Attorney General, Office of the Attorney General, Indianapolis, for Appellee.

SELBY, Justice.

John Deckard was convicted of felony murder for the burglary and subsequent death of Mr. Barry Scroggins. Deckard was tried to a jury, found guilty, and sentenced to sixty years imprisonment. A description of the events surrounding his arrest and conviction follow.

The victim, Barry Scroggins, lived in a cabin in a rural area of Monroe County, Indiana. Near Scroggins' cabin was an abandoned home at which youth from the area congregated. Defendant Deckard, then seventeen, and his friend Will Taylor, age twenty, frequented the abandoned home, often overnight. On July 27, 1991, Deckard, Taylor, and several of their friends were stranded at the home after their car broke down. That evening Deckard and Taylor left the house on foot, returning several hours later with a pickup, two pistols, and a rifle. That evening, Barry Scroggins, the victim, reported to police that someone had broken into his cabin and stolen three guns and his pickup. Deckard sold two of the guns a few days later, and, after selling parts of the truck to raise money for spirits, abandoned it. The record indicates that Deckard conducted something of a petty-crime spree over the next several days, including repeated intrusions upon Scroggins' cabin in Scroggins' absence.

On August 7, 1991, Scroggins apparently met intruders at his cabin. At that meeting, Scroggins suffered a single gunshot wound, the bullet piercing his sternum. The bullet

proved to be of the same caliber as one of the guns possessed by Deckard, and forensic evidence admitted at trial indicates that the bullet could have come from that weapon. Scroggins, within fifteen minutes of receiving the wound, passed on.

The next day, August 8, 1991, while responding to a report of gunshots being fired, police discovered Deckard driving the victim Scroggins' blue Camaro. Three other young men and a young woman were also in the car. Investigating, officers found Scroggins' wallet, guns, and clothing in the car. After further investigation, Deckard assisted police in recovering various stolen items, and was subsequently released to his grandparents.

Later that day, Deckard went with his family to the Bloomington Police Department. Bloomington Police Officer Daniel W. Conley informed Deckard of his rights. Deckard and his parents waived those rights, and Deckard gave a statement admitting that he knew of Will Taylor's intent to return to Scroggins' cabin, burglarize it again, and steal Scroggins' blue Camaro, killing the owner if necessary. Deckard also admitted helping Taylor after the killing, but denied actually participating in the murder.

Deckard was subsequently tried, convicted of felony murder, and sentenced to sixty years imprisonment. He now presents his direct appeal.

■ Deckard first challenges the sufficiency of the evidence demonstrating that the victim was, as charged in the information, killed in the course of a burglary. When examining the sufficiency of evidence presented at trial, we neither weigh the evidence nor resolve questions of credibility; rather, we look only to the evidence and the reasonable inferences therefrom which support the verdict. If, at trial, there was evidence properly admitted from which a reasonable trier of fact could conclude that the appellant was guilty beyond a reasonable doubt, we will affirm the conviction. *Hazzard v. State* 642 N.E.2d 1368, 1369 (Ind.1994), *citing Case v. State,* 458 N.E.2d 223, 225 (Ind.1984).

■ Deckard argues that the State failed to provide evidence sufficient to support the jury's recommendation that the killing of the victim occurred during the underlying felony, burglary. He claims that the evidence merely indicated he had burglarized Scroggins' cabin at some time, and that he was present at Scroggins' cabin at the time of the murder. Deckard posits an alternative scenario, which would not support the felony-murder conviction: that the shooting did not occur during a burglary of the cabin, but only during an auto theft. He reminds this Court that auto theft is not a crime which supports felony murder. He contends that it is possible, based on the evidence admitted at trial, that he and Taylor completed the burglary, left the scene, and later returned to Scroggins' cabin only to steal his car, and that Scroggins was killed during the latter endeavor. He concludes, therefore, that he has demonstrated that the trial court received insufficient evidence to support the verdict.

■ Deckard's theory is consistent with the evidence, as are alternative theories. At trial, the State suggested that on the evening of August 7, at 5:00 p.m., Deckard and Taylor were busily engaged in removing items from the victim's home and packing them up. Initially shuttling between the abandoned home and Scroggins' cabin on a stolen motorcycle, their ultimate goal was to acquire Scroggins' blue Camaro, pack it full of items already removed from Scroggins' cabin, and "head South." Earlier that day Scroggins' cabin had been broken into by breaking a downstairs window. At 7:00 p.m., the victim was, after shopping, on his way home. By 8:30 p.m., Deckard, accompanied by Taylor, was driving the Camaro, and had the victim's wallet and checkbook. Although police found Scroggins' body, covered with a blanket from inside his cabin, in the yard outside his house, evidence indicated that Scroggins had been shot while standing on a second-floor porch immediately outside a doorway. The only access to the porch was via an interior stairway. With this evidence, the trier of fact could conclude beyond a reasonable doubt that either Deckard or Taylor shot and killed Scroggins when he arrived home and discovered them burglarizing his home. The trier of fact could similarly conclude that Deckard, Taylor, or both continued to remove property from Scroggins' home after

Scroggins' murder. The evidence was sufficient to show that the victim was killed during the course of a burglary, or a continuous chain of events that included a burglary, in which Deckard participated. *See Eddy v. State,* 496 N.E.2d 24 (Ind.1986). Even when a conviction is supported by nothing but circumstantial evidence, such evidence on appeal may still be deemed sufficient though it does not disprove every reasonable hypothesis of innocence. *Davis v. State,* 598 N.E.2d 1041 (Ind.1992), *reh'g denied, cert. denied,* 510 U.S. 948, 114 S.Ct. 392, 126 L.Ed.2d 340 (1993). The evidence is sufficient to support Deckard's felony-murder conviction.

Deckard next raises a claim of prosecutorial misconduct. During the course of the trial, two witnesses, Jason Kelley and Kim Greene, advised Monroe County Deputy Prosecutor Katherine Burns that they had made false statements in depositions that they gave to Deckard's attorney. Deputy Prosecutor Burns advised both Kelley and Greene to contact Deckard's attorney. They never made this contact, and Deckard's counsel did not learn that these witnesses had changed their story until they testified. Deckard's attorney impeached witness Kelley, then moved for a mistrial. The trial court denied Deckard's mistrial motion.

Mistrial is an extreme remedy, costly in consequences, warranted only when less severe remedies will not satisfactorily correct the error. *Dalton v. State,* 504 N.E.2d 568, 570 (Ind.1987). To succeed with a motion for mistrial, Deckard must demonstrate that the prosecutor's failure to inform him of the change in the testimony placed Deckard in a position of "grave peril" to which he should not have been exposed. Rather than attempt to quantify the degree of the impropriety of the prosecutor's conduct, we consider only the probable persuasive effect of the evidence resulting from the misconduct on the jury's verdict. *Id.*

In the case at bar, it is difficult to ascertain what effect, if any, Kelley's testimony had on the verdict. Jason Kelley's testimony did not differ significantly from his deposition testimony. Nevertheless, Deckard's trial counsel effectively cross-examined and impeached Kelley on the minor inconsis-

tencies between his deposition and trial testimony, before raising the prosecutorial misconduct objection. We strongly discourage surprise testimony from witnesses at trial, and can easily envision situations where the prosecutor who knows of such changes and fails to advise opposing counsel would commit prosecutorial misconduct. However, it seems here that any surprise testimony was effectively countered during cross-examination. The record indicates that the trial court acted properly to protect Deckard's interest in presenting an effective defense, and does not disclose that Deckard was subjected to peril of sufficient gravity to support his motion for a mistrial. See *Schlomer v. State,* 580 N.E.2d 950 (Ind.1991). We affirm the trial court's decision to deny Deckard's motion for a mistrial.

Deckard raises an additional evidentiary objection. During trial, the State introduced a pair of gloves allegedly discovered in a knapsack, after Deckard's attorney had examined the knapsack. Deckard's trial counsel objected to admission of the gloves, because the gloves were not listed as an exhibit. The State argued that it had no duty to inform that it had discovered these gloves, because Deckard's counsel had ample opportunity to discover the gloves during the examination of the knapsack before trial. Deckard's trial counsel moved for a mistrial, which the trial court denied.

Deckard is correct in his assertion that it is prosecutorial misconduct of the highest order should the State intentionally withhold exculpatory evidence requested by a defendant. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He fails, however, to demonstrate that these gloves were in any way exculpatory, or to explain in any way what evidentiary value the gloves possess. The gloves seem only tangentially related to the case, do not seem to make any material issue more or less likely to have occurred, and as such, appear irrelevant. As evidence, they had little if any impact. The decision to admit them, while perhaps erroneous, does not justify the extreme remedy of a mistrial. The decision of the trial court

to deny Deckard's motion for a mistrial is affirmed.

■ Deckard challenges the trial court's decision to admit, over his objection, his statements to police. The State called as a witness Bloomington Police Officer Anthony Bruner. Officer Bruner testified that he arrived at the scene where Deckard and his friends had been stopped, and asked each youth present for his or her name, age, and identification. He heard Jason Kelley say that Deckard had stolen guns. Bruner testified that he decided to impound the car and its contents and arranged to have the car towed from the scene. He testified that he recovered a stolen motorcycle from Lake Monroe. He did not attribute any statements to Deckard during his testimony, and no objection was made during his testimony. Nevertheless, Deckard now argues that Officer Bruner's testimony implied that Deckard stated his name and age when Officer Bruner began his investigation at the scene, and that, because Deckard had not yet received a Miranda warning, this *implied* statement should not have been admitted. While we admire Deckard's appellate counsel's creativity in recognizing and articulating this imputed testimony issue, we cannot assign error to the admission of Officer Bruner's statements. Such statements constitute admissible responses to general investigatory questioning. *Wissman v. State,* 540 N.E.2d 1209 (Ind. 1989).

■ Deckard challenges other aspects of Officer Bruner's testimony. During cross–examination, the defense called upon Officer Bruner to describe how Deckard helped Officer Bruner locate the stolen motorcycle and some items stolen from Scroggins' cabin. During Officer Bruner's testimony on this point, he stated that he had drawn his pistol and pointed it at Deckard, who was, at the time, only seventeen years old. Concerned that the jury might believe that Officer Bruner's decision to display his weapon to a seventeen year old boy was an untoward use of force, the prosecutor asked Officer Bruner to further explain his decision to draw his weapon. Over Deckard's Miranda objection, Bruner was permitted to testify that while driving to the abandoned home to locate some additional stolen items, Deckard had questioned him in detail about the firearms in the police car. Deckard's interest in and familiarity with firearms raised in Officer Bruner a concern that Deckard might have stashed a weapon in the abandoned home. When, at the home, Deckard moved abruptly and reached beneath some floor boards, Officer Bruner feared that Deckard was reaching for a weapon. It was this concern that caused Officer Bruner to draw his own weapon. Deckard challenges the admission of Bruner's testimony in this regard, because at the time he asked the questions about the firearms in the police vehicle, he had not yet been advised of his Miranda rights. We believe, however, that the admission of these statements was permissible under the standards established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* applies only to custodial interrogation. At the time Deckard demonstrated his familiarity with weapons, Deckard was not being interrogated. It was Deckard who asked Officer Bruner about these weapons. The trial court's decision to admit this testimony was not error.

As stated above, after providing assistance to Officer Bruner's investigation, Deckard was taken to the home of his grandparents where he remained for several hours. Later, Deckard and his parents came voluntarily to the police department. Using a standard waiver form, in the presence of both Deckard and his parents, Officer Conley advised Deckard of his Miranda rights, and then left the room. When Conley returned, a second officer, Officer Brahaum was in the room, and Deckard and his parents had signed the Miranda-rights waiver form. Our requirements for the interrogation of juveniles are set out in *Lewis v. State,* 259 Ind. 431, 288 N.E.2d 138 (1972), and codified at I.C. § 31–6–7–3. The Bloomington police officers complied with those requirements when acquiring Deckard's waiver. After acquiring this valid waiver, Bloomington police heard Deckard's confession.

■ Nevertheless, Deckard now argues that his confession is inadmissible. He contends that the confession is inadmissible because (1) the post-Miranda confession was

the result of statements he made to police during their pre-Miranda investigation, "fruit" as it were "of the poisonous tree" *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and (2) Deckard's recent intoxication and lack of sleep rendered him unable to give a valid consent to the interrogation. We disagree with Deckard's conclusion that his confession is inadmissible. The record contains no suggestion that police engaged in any pre-Miranda custodial interrogation. The Bloomington police did not interrogate Deckard, either directly or by placing him in a situation likely to induce incriminating disclosures. Because we find no poisonous tree, i.e. unwarned custodial interrogation, there can be no illegal "fruit" thereof. *Id.* Since the earlier investigation was not custodial interrogation, it is not possible for it to taint the later statements. We add that, even if the earlier statements were the result of an improper custodial interrogation, the results of this later station-house interrogation, where Deckard had been properly apprised of his rights, would remain admissible. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

The State must demonstrate that the appellant's waiver of his Miranda rights was knowing and voluntary. *Light v. State,* 547 N.E.2d 1073, 1079 (Ind.1989)(citing *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 523, 93 L.Ed.2d 473, 485 (1986)). The analysis begins with the presumption that appellant did not waive his Miranda rights. *Id.* However, the State introduced the waiver form, signed by Deckard and his parents, which is adequate evidence of a valid waiver. Deckard has not explained how his earlier intoxication or his alleged lack of sleep rendered his waiver execution inadequate. Intoxication and lack of sleep are merely factors to be considered by the trial court in determining voluntariness. *See Burdine v. State,* 515 N.E.2d 1085, 1092 (Ind. 1987), *reh'g denied.* Deckard's confession was properly admitted.

Finally, Deckard argues that the trial court erred in imposing an aggravated sentence. Ind.Appellate Rule 17(B) directs our review of the sentence. The Rule directs us first to determine whether the sentence appears to be disproportionate, "manifestly unreasonable in light of the nature of the offense and the character of the offender." *Fointno v. State,* 487 N.E.2d 140, 145 (Ind. 1986). If we identify a sentence as manifestly unreasonable, we must then determine whether "no reasonable person could find such sentence appropriate to the particular offense and offender." *Id.* Only when both prongs of App.R. 17 are met will we revise a sentence to render it reasonable. *Id.* Otherwise, authority to sentence resides with the trial court. *See Fugate v. State,* 608 N.E.2d 1370 (Ind.1993).

Deckard was convicted of felony murder, and received the maximum possible sentence, sixty years. The trial court identified Deckard's tender years and troubled family history as mitigating factors. The trial court identified Deckard's criminal record, his need for treatment in a penal facility, his earlier failed attempts at rehabilitation, his character, his attitude, and his lack of remorse as aggravating factors. The court decided that the aggravating factors significantly outweighed the mitigating factors, and that a sentence of sixty years was appropriate. Deckard knowingly participated in a burglary which resulted in Barry Scroggins' death, a result, given the facts of this case, which was certainly foreseeable. We cannot, in this instance, say that a sentence of sixty years is manifestly unreasonable.

The decision of the trial court is, in all respects, affirmed.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

DeBRULER, J., concurs in affirming the conviction, but would order a sentence reduction to fifty years.